IN THE UNITED STATES DISTRICT COURT

STATE OF NEW JERSEY

NEWARK DIVISION

CLERK
U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY
RECEIVED

2026 OCT -1 A 11:26

SEAN CADDLE,
PETITIONER,

V. CIVIL NO. 24-8766

UNITED STATES OF AMERICA,
RESPONDENT.

MOTION TO SEAL AND/OR RESTRICT

PUBLIC ACCESS TO IDENTIFYING INFORMATION

Petitioner Sean Michael Caddle, appearing pro se, respectfully moves this Court for an Order permitting Petitioner to file under seal the unredacted version of his Amended Motion pursuant to 28 U.S.C. § 2255, or in the alternative, permitting Petitioner to redact from the publicly accessible version the names and identifying information of certain elected officials and consultants who were not indicted or charged in Petitioner's underlying criminal case.

In support of this application, Petitioner states as follows:

Petitioner is filing an Amended Motion pursuant to 28 U.S.C. § 2255.

The amended Motion contains references to certain elected officials who were not indicted, charged, or named as defendants in Petitioner's underlying criminal case.

Petitioner believes that publicly identifying these individuals in connection with allegations, factual assertions, or matters discussed in the § 2255 proceeding could unnecessarily associate these uncharged individuals with the criminal proceedings and could cause reputational or other harm unrelated to the issues that the Court is required to decide.

Petitioner is not seeking to conceal information from the Court. To the contrary, Petitioner requests that the Court have access to the complete, unredacted information so that the Court may evaluate Petitioner's claims in their entirety.

Petitioner therefore respectfully requests that the Court permit Petitioner to submit an unredacted version containing the individuals' names under seal, while permitting Petitioner to file a publicly accessible version in which those individuals are identified by neutral designations such as "Elected Official A," "Elected Official B," and so forth. See Exhibit A.

Petitioner believes that this narrowly tailored procedure would protect the identities of

individuals who were not charged while preserving public access to the substance of Petitioner's § 2255 claims.

To the extent the Court determines that complete sealing of the Amended Motion is unnecessary, Petitioner respectfully requests the less restrictive alternative of permitting the Amended Motion to be publicly filed with the specified names and identifying information redacted and permitting the unredacted version to remain under seal for the Court's review.

Petitioner makes this request pursuant to Local Civil Rule 5.3 and respectfully requests that the Court apply the least restrictive means necessary to protect the interests identified above.

Petitioner further requests that the Court permit the sealed version and the public redacted version to be maintained in accordance with the District of New Jersey's procedures governing sealed filings.

WHEREFORE

Petitioner Sean Michael Caddle respectfully requests that this Court:

A. permit Petitioner to file under seal an unredacted version of his Amended Motion pursuant to 28 U.S.C. § 2255 containing the names and identifying information of the uncharged individuals including elected officials, attorneys, and other members of the community that are leaders in their fields. We are trying to avoid them being tainted by the press or others with allegations of corruption;

B. permit Petitioner to file a redacted version of the Amended Motion for public access, with those individuals identified by neutral designations rather than by their names (See Appendix A for recommended names for redaction and accompanying designations);

C. prohibit public access to the sealed, unredacted version except as authorized by the Court; and

D. grant such other and further relief as the Court deems just and appropriate.

Respectfully Submitted,

Sean Michael Caddle
Petitioner, Pro Se

Dated: September 21, 2026

# APPENDIX A

Individuals Identified (In Order Of Appearance) And Recommended Neutral Designations:

| | |
|---|---|
| A.U.S.A. Cortez | Government Attorney 1 |
| Senator Raymond J. Lesniak | Elected Official 1 |
| International Longshoremens Association (ILA) | Organization 1 |
| Paul Weiner (Attorney) | Attorney 1 |
| Donald Knuckle (Developer) | Developer 1 |
| Jonathan Williams (Attorney) | Attorney 2 |
| Mark Bryzick (FBI Agent) | FBI Agent 1 |
| Josh (FBI Agent) | FBI Agent 2 |
| A.U.S.A. Sean Farrell | Government Attorney 2 |
| Mark Bonomo (Reporter) | Reporter 1 |
| Stephanie Wohlrab (Consultant) | Consultant 1 |
| Senate President Nicholas Scutari | Elected Official 2 |
| Judge Vasquez | Federal Judge 1 |
| Mike Crichley (Attorney) | Attorney 3 |

IN THE UNITED STATES DISTRICT COURT

STATE OF NEW JERSEY

NEWARK DIVISION

CLERK
U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY
RECEIVED

2026 OCT -1 A 11:26

SEAN M. CADDLE,
PETITIONER,

V.

CIVIL NO. 24-8766

UNITED STATES OF AMERICA,
RESPONDENT.

Honorable Judge Michael E. Farbiarz

MOTION FOR LEAVE TO SUPPLEMENT THE RECORD,

FILE A SUPPLEMENTAL MEMORANDUM,

AND STAY/DEFER RULING PENDING CONSIDERATION

OF NEWLY DISCOVERED EVIDENCE

Comes now the Petitioner, Sean Caddle, pro se, and respectfully moves this Honorable Court for leave to supplement the record in support of his Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255, and to defer or stay any final ruling or decision on an evidentiary hearing pending consideration of this supplemental evidence. In support thereof, Petitioner states as follows:

1. PROCEDURAL BACKGROUND

1. Petitioner timely filed a Motion under 28 U.S.C. § 2255 asserting claims of ineffective assistance of counsel and/or related constitutional violations.
2. The Government submitted its response, which included statements/affidavits from Petitioner's former trial counsel, Mr. Jacobs.
3. Petitioner filed his Reply to the Government's and Mr. Jacobs' responses.
4. The matter is currently pending before this Court for determination, including whether an evidentiary hearing is warranted.

2. NEWLY DISCOVERED EVIDENCE

1. Petitioner has recently obtained vital new evidence that directly contradicts assertions made by former counsel, Mr. Jacobs, in his response to Petitioner's § 2255 motion, and strongly supports Petitioner's underlying claims.
2. Specifically, Petitioner has obtained a transcribed audio recording of a communication between Petitioner and Mr. Jacobs.
3. This transcribed audio recording contains specific, material statements regarding Mr. Jacobs' claims to the Court that he was in regular communication with Mr. Caddle, that he also communicated extensively about the factual basis questions that would be posed in a plea hearing, about sentencing submission that was sent to the Court was not factual as it is clear Mr. Jacobs didn't know much about Mr. Caddle's cooperation at all in Exhibit A. Exhibit B shows, in email to Mr. Barbone that he was not happy and states clearly that Mr. Jacobs is not aware of Mr. Caddle's cooperation at all. Exhibit C shows clearly Mr. Barbone was misleading Mr. Caddle by stating something unethical was taking place between the Jacobs Barbone Firm, the Judge's former law

partner, and the Judge.

4. This evidence was not previously available or fully transcribed at the time Petitioner filed his initial reply.

3. LEGAL ARGUMENT

1. Rule 7 of the Rules Governing § 2255 Proceedings explicitly authorizes the Court to expand the record with additional materials, including transcripts, letters, and documents, to properly evaluate the necessity of an evidentiary hearing or the merits of the motion.

2. Under Federal Rule of Civil Procedure 15(a) (applicable via Rule 12 of the § 2255 Rules), leave to amend or supplement pleadings should be freely granted when justice so requires.

3. Granting leave to supplement the record will not prejudice the Government or former counsel, nor will it cause unnecessary delay, as no final judgement or ruling on an evidentiary hearing has yet been rendered.

4. The transcribed audio recording is central to resolving the factual disputes existing between Petitioner's account and Mr. Jacobs' statements, making it essential to a full and fair adjudication of Petitioner's constitutional claims.

5. The audio recordings demonstrate that Edwin Jacobs Jr., my attorney, was not involved in a number of critical legal discussions, that, instead, Jordan Barbone provided me with legal advice on a regular basis despite not being a licensed attorney. They further demonstrate that Mr. Jacobs was not aware of critical information or developments in my case, and that he was ignorant of all the happenings (or lack thereof) surrounding my role as a cooperating witness.

6. Mr. Jacobs' lack of engagement prejudiced the outcome of my case in at least two ways:

7. Had Mr. Jacobs engaged with the Government and represented me as a cooperating witness effectively, I would have almost definitely benefited at sentencing from a stronger cooperation record, especially since the judge noted my relatively minimal level of cooperation in imposing his sentence. Despite my having a substantial amount of actionable information on major political corruption, Mr. Jacobs never engaged with the Government to follow up on my initial cooperation agreement.

8. Had Jordan Barbone not insinuated that Mr. Jacobs and his firm held (unethical) influence over the Judge through a civil suit they had recently filed, I would have followed through with my change of plea and gone to trial in a case where the only witnesses were multiple convicted felons intent on avoiding long murder sentences and where there was no direct evidence tying me to the case's murder. Mr. Barbone was not even a licensed attorney at the time and never should have been placed in a position by Mr. Jacobs to advise (and pressure) me on something as critical as a change of plea.

4. PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Honorable Court:

1. Grant Petitioner leave to supplement the record with the attached transcribed audio recordings (Exhibit A), (Exhibit C), and Email Transcription (Exhibit B);

2. Stay or Defer rendering an opinion or ruling on the pending § 2255 motion and evidentiary hearing determination until the court has reviewed and considered this supplemental evidence; and

3. Grant such other or further relief as the Court deems just and proper.

Dated: September 22, 2026

Respectfully Submitted,

[signature]

Sean M. Caddle
Reg. No. 83176-509
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640
*Petitioner Pro Se*

CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of September, 2026, a true and correct copy of the foregoing Motion for Leave to Supplement the Record was served via U.S. First-Class Mail, postage prepaid, to the United States Attorney's Office at:

Hon. Michael E. Farbiarz
United States District Judge
Frank Lautenberg Post Office and U.S. Courthouse
District Of New Jersey
Newark, New Jersey 07102

United States Attorney's Office

CIVIL NO. 24-8766

Submitted:

Sean M. Caddle
Reg. No. 83176-509
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640

EXHIBIT A

EXHIBIT A
TRANSCRIPT
OF
AUDIO RECORDING

June 16, 2023
11:00 A.M. EST
Participants: Edwin Jacobs
Jordan Barbone
Sean M. Caddle

-S.C.: [00:00:00] (room ambi, kids crying) [00:01:00] Am I doing this [00:02:00] right?

-J.B.: Yeah.

-E.J.: You can hear me?

-S.C.: Yeah, I can hear you.

-E.J.: All right. I fucked up 'cause I did it from my cell phone.

-S.C.: I'm on a cell too because I ain't got internet at the house so.

-E.J.: Do you have camera?

-S.C.: Yeah, I have a camera.

-J.B.: Alright. See if it works. Do you see a little, do you see a little thing that has a, uh, camera screen?

-S.C.: No, it actually was on there. I sent you a screenshot. It was on there, but now, like, when I'm looking at it now, it's just I could see you. Yeah, I'll send you a screenshot.

-J.B.: I see it.

-S.C.: No, but I'll send you what it looks like now because there's no, that one has a thing for the camera that I, but this one don't.

-E.J.: Okay. Click your cell phone.

-S.C.: Okay. Oh wait. You see?

-J.B.: See where

-S.C.: [00:03:00] the mute button is? There should be a video screen. Hold on. Oh wait, I see it at the bottom

-J.B: there. You're,

-S.C.: yup.

-J.B.: Okay.

-E.J.: Alright. Morning Sean. How are you?

-S.C.: How's it going?

-E.J.: Alright. Firstly, I'm very sorry about the loss of your mother.

-S.C.: Oh, thank you.

-E.J.: It was, uh, you don't get any adjustment time in a situation like that?

-S.C.: Not at all.

-E.J.: We had my wife's father for four years living with us, and he just died April 11th at 98.

-S.C.: 98. Oh God.

-E.J.: So we had plenty of adjustment time.

-S.C.: Yeah.

-E.J.: You were in the opposite situation where you had none. Who knows what's better? I don't know.

-S.C.: Yeah I don't know. I always say, [00:04:00] you know, when I lost my father, I went, I, they gave me a week off of work. I went to work the next day. I couldn't sit at home waiting for him to come home. Yeah, yeah, yeah. I know.

-E.J.: Well, I'm sorry.

-S.C.: Thank you.

-E.J.: Uh, lemme, uh, repeat what I told. I've only represented a cooperating witness at a federal case three times before and one time, uh, in a state case. So I'm by no means an expert. Uh, I spent my 50 year career trying cases, uh, cross-examining, cooperating witnesses, but have little experience representing them. Um, now with that disclaimer. Here is what I have evolved as a strategy over the last couple days. Uh, the US attorney has told Jordan more [00:05:00] than once that you have earned a very, uh, healthy, uh, 5K departure motion or letter, but for the last week or two, he's been unresponsive. Uh, if we had in our possession a draft of his, uh, 5K motion or letter, uh, and if it were submitted to the judge under seal so the press doesn't have it, then we could have a pretty good script for what we want to say to the judge on your behalf on the sentencing day. But we don't have that now. We'll continue to press him. And give it to the judge ahead of time, and we probably will have it ahead of time, but we shouldn't wait for him and we can't count on him to say everything that we think needs to be said on your behalf. [00:06:00] Now there are two parts to our presentation on your behalf. The first part. I think, uh, is a short legal memo, which states the obvious. Judge. We've got a plea agreement. The, uh, schedule guideline calculation is 150 to 300 months. But as you know, judge, uh, these guideline calculations are no longer binding since the Booker decision. They're just advisory, uh, and, uh you can take that advice or not take that advice. Uh, and judge, we have a cooperation agreement. Uh, so the things you've gotta look at are the schedule, the cooperation agreement, and of course the sentencing statute, 18 USC 35 53. That'll be in a sentencing memo, [00:07:00] which will segue to part two. The sentencing memo will say. Uh, judge we're, uh, we are not going to make specific references to any persons who are the subjects of this investigation in which we're cooperating, uh, for obvious reasons. You know, we're not going to put into the public domain a secret US attorney, FBI, grand jury investigation. On the other hand, we want you to know, uh, what we have done now here is what I have strategized yesterday and today, and I've explained it to Jordan. It makes sense to us, and hopefully it makes sense to you. I think we have to divide this conference into parts today and [00:08:00] I would like to have in my hand when I walk into court. I would like to have in my hand 3, 5, 7, 9 pieces of paper. One for target A, one for Target B, one for Target C, one for Target D. In other words, if in the last 20 months you have talked to them, worked with them, helped them with seven or eight or nine potential targets. We want a piece of paper for each one. Now we're not gonna say their names for obvious reasons, but we are going to tell the judge that there are five or seven or nine or eleven. So that tells the judge that you, one person, have,

[00:09:00] uh, been helping the FBI and the US attorney and their investigations of way more than one, you know, five or seven or ten people.

-S.C.: Mr. Jacobs, what's, I don't mean to cut you off. I know you,

-E.J.: That's alright.

-S.C.: The, I don't have a problem with any of that. It sounds good to me. But the problem is, is after we did that initial proffer that you were at, remember we, yes. Yes. They never questioned me about any of the other people. So, and I was explaining this to Jordan like, 'cause I was getting worried about it, that you are saying, I've earned this stellar letter. I figured we were gonna have this conversation at some point, but I'm being honest with you. Like I wish I could tell you, they asked me about 37 people. They didn't even ask me about the other four people in the proffer. They all my interaction with the FBI after we. So prior to court we [00:10:00] worked on Tony, I did a video recording of him, an audio recording of him telling me to lie, all of that. Then we got rushed into court. They shut the cooperation down on January 13th and a call to you, you spoke to Cortez on the 14th, sent me a memo. We were taken into court two weeks later after we were taken into court. The only interactions I had with the federal government was on payments to Tony. And they did one meeting, Jordan would have to look it up because there's emails between me and Jordan because they brought organized crime guys to my house. And the only, I couldn't even tell you, Mr. Jacobs, uh, most of the names they asked me about because I didn't know them, I thought it was a waste of time. And then they circled back. They asked me for Ray Lesniak's cell phone number, which I thought was odd considering David, like you could Google it and. And, uh, the ILA was another one other question that I remember [00:11:00] that I could answer. But the other people on the proffer, Ray, Paul, uh, Donald Knuckle, Jonathan Williams, I was never asked questions about, I was never asked to provide documents. I was never asked to nothing.

-E.J.: Okay, well that, that surprises me. I would've guessed, uh, that they, they would've spent considerable time. Probably in separate sessions, uh, asking your help on lots of different people. But they didn't do it.

-S.C.: No.

-E.J.: Didn't do that?

-S.C.: No.

-E.J.: Okay. Well if they didn't, uh, then there's no point in us trying to fabricate a list.

-S.C.: That's why I was telling you.

-E.J.: 'cause they did not approach it that way. Um, well, let me try to make, uh. Progress this way. The rest of my thought was after identifying the hypothetical ten [00:12:00] targets with which you helped them to take each piece of paper and list the types of help you gave them, for example. One type of help would be, uh, to listen to their recordings and give them some context. Identify speakers or tell 'em what it was about. Another type of help would be hand them recordings that you made that they did not have. Another type of help would be, uh, look at letters, memos, text messages, emails that they had. Uh, and help them, contextualize them, explain them, uh, or as before if you had any,uh, that you offered up to them. Uh, they may have had surveillance, they may have had visual surveillance, they may have had photographs. And often, uh, they will ask a cooperating witness, you know, [00:13:00] here's surveillance on this date. What happened right before that? What happened right after that? You know, can you put any meat on the bones for this? There are five, six examples of the types of cooperation, uh, which are typical, and in your case, at least one is atypical and that's turning over your own recordings. That does happen, uh, but it's, it's not, uh, not, not, uh, very, uh, that happen very often. Uh, are we able to assemble that? Are we able to give the judge an outline of the types of help you gave them?

-S.C.: I can, uh, for the recordings, you know, I, we've always stated it was around 300 recordings of

yours. Of mine.

-E.J.: Of yours.

-S.C.: Okay. And, and what? I can't break down in two days, Mr. Jacobs. I didn't know we needed to, is like, I can't say for certain that well. Uh, just say [00:14:00] a hundred of them are Tony Ts, uh, 20 of Ray, 10 of Paul, and I could tell you for sure that zero, you know, again, going back to the initial five people that. We proffered and said, okay, this is what we have. Yeah. Um, Donald Knuckle wasn't on any recordings, and I'm not sure if Jonathan Williams was, if he was, it would've been one or two. And I don't wanna lie and say, oh, he was on two recordings and he wasn't on any, and you come back to me and say, what the hell, July for, uh, I'd have to listen to 300 recordings to get a base to see if Jonathan was on any of them. And so, and then to answer your next question, they never came to me. With anything. I offered to give them emails. I offered to even give them additional tape recordings. I explained to the agent, Mark Bryzick, that, uh, and I have this, I actually taped this conversation because I knew this was gonna happen. I said to him, I said, Mark, I was getting nervous. So what I used to do, [00:15:00] me and my wife's from Columbia, so what I used to, we would send gifts at Christmas and clothes. So I took a USB and shipped it to Columbia. 'cause I didn't want anybody to be able to grab it. And I said, I already told my in-laws, send that USB back to me. That's got a couple hundred recordings on it. You let me know if you want it. And he never asked for it. He never wanted it.

-E.J.: Well that's baffling. Why, why would they not take that?

-S.C.: Mr. Jacobs, I could play the tape for you. I could play. From that moment on, I taped every conversation with him so you, you could listen. He never requested emails from me, text messages, pictures, um, you name it. I never got 'em. It never happened.

-E.J.: But they did take 300 recordings that you had made of numerous people.

-S.C.: Yeah. They, took them when they raided my house and they just gave them back to me last week.

-E.J.: Okay. There's a [00:16:00] difference between what they got in a search and what you voluntarily turned over. So the 300 to which you referred, were they seized from you?

-S.C.: Yes.

-E.J.: Alright. Aside from those that were seized from you, did you turn any other recordings?

-S.C.: No, I made the offer and he never, I told him, let me know if you want them, and he never asked me for 'em.

-E.J.: So 300 seized, others were offered,

-S.C.: Yes. And I offered, you know, um, I need to tell you this because I think it's important. When they brought that organized crime people to my house, that one meeting is about an hour. Uh, I really couldn't answer most of their questions, Mr. Jacobs. They would name people. I don't even know who the hell they were. But what happened at the end, I dealt with an agent, Mark Bryzick. He had a partner named Josh. I didn't particularly like him. He didn't particularly like me. [00:17:00] At the end of the meeting, I was, I'm always cordial. I said, Hey guys, if there's anything else you need help with, please let me know. You know, and the guy, Josh got snippy with me and he said, well your lawyers reached out to us, uh, about organized crime saying, you know, that you didn't wanna talk about that. And I said, I don't wanna talk about anything. I'm not gonna get credit for it. And his exact words was, we brought these guys here today to help you. I got really pissed. I didn't say nothing. Later, I called Mark, the agent I had my most interaction with, and I said, Mark, Why are you bringing organized crime guys to my house to help me when we don't even go over the political people that I offered up to you? Like, I don't get it. We are not even going over what I said I could give you. You are just telling me you've got people showing up at my house, asking me questions about people I don't know instead of asking me what I

do know. Okay? And he goes, oh, I think you took it the wrong way. I said, okay. I said, well, I don't think I took it the wrong way, his exact words, it [00:18:00] looked me dead in the face, said, we are bringing these men here to help you. And I said, well, then let's go over the political stuff. And he just took a side ramp off the conversation and it never got brought up again.

-E.J.: Well, quite a period of time has passed since we signed these agreements. It was October of 21, so you got all of 22 and half 23. You got about a 20 month period. In this 20 month period, how many debriefings did they actually conduct with you in person?

-S.C.: No, none.

-E.J.: Well, person or telephone.

-S.C.: Uh, on the telephone we strictly talked about Tony Ts and money given to him, and that ended, that ended Mr. Jacobs in, I'm gonna give you a wrong date out. I'm gonna tell you that call ended in March or April of 22. [00:19:00] They brought the organized crime guys to my house pre June of 22. And from that moment forth, we never spoke again about anything related to any crimes or anything.

-E.J.: So since the spring of 22, that's more than a year. There's been no contact with them? No in person or telephone debriefings?

-S.C.: No. None. Zero. No. No. That's a lie. I'm sorry. They would call me around election time. Like a week before election day, and according to the agent, these were standard questions they asked all people that were cooperating in politics. They would ask me like, these are absurd, Mr. Jacobs. I'm a cooperating foreman, and everyone knows me, so no one's talking to me. Are you aware of, um, anybody who's threatening poll workers? No Are you aware of anybody operating with the foreign government during an election, this election cycle? No. And I would get [00:20:00] those once one, you know, one or two weeks before the primary, and one or two weeks before the general, and I said to the agent, I wasn't being disrespectful. I said, Mark, I said, no one talks to me. I wouldn't have this information. No one's gonna call me and say, Hey, we're wheeling money with a Russian operative. Or an Italian operative. What do you think?

-E.J.: Well, hold on. Can I, Sean, I just wanna say something with regard to. Not you, you saying you haven't done anything since last April or May of 2022. Correct? Um, it wasn't until late November or early December that Tony Teixeira was pleading guilty. So do you actually, I mean, could the timeframes be

-S.C.: No. No. Jordan, the timeframes are positive. I'm telling you, I'm giving you. Like it, I, I'm pushing it out to April, that was my last phone call. I really think that's [00:21:00] not true. I think my last phone call in regards to Tony came in March. I'm gonna say April, just to extend it and give 'em the benefit of the doubt. Hey, hey. It definitely didn't go into May.

-E.J.: So the, from what you're saying, the boundaries sound like. Uh, from October of 2021 when we signed the agreements until April and May of 2022, had a period of maybe seven months in there that you say is the only active, uh, uh, cooperation. Uh, the only time period during which you were being questioned about anything.

-S.C.: Yeah, so if you go to, we signed the agreement. I want to get this right, to make, let me just verbalize it. We signed the agreement. We did two or three meetings in person. Jordan was on, he got, uh, COVID, so he would call in. The last one was in Springfield before Christmas. Remember Jordan, you had [00:22:00] COVID? Yep. Yep. It was in Springfield. We were told they would follow up with us. We never did another in-person meeting ever again. I didn't lie about nothing, Mr. Jacobs, I was an open book about whatever they wanted to talk about, and that was the last in-person meeting we ever did. Then they turned me over to Bryzick and Josh. From that point forward, the focus was, um, I got on a campaign with Ray, remember, so I did, I taped one meeting with Ray and that was the day you got the call that I went in to do the video with Ray, and that's the day you got the call at the office from Cortez saying, we're

shutting this down. Now, prior to that, I told the agent. Uh, four or five days prior to that, Mr. Jacobs, I don't need to be a lawyer to know when I break the law, Ray was on the phone with me. I taped it on my own recorder telling me he wanted me to wash money outta Bayone through my [00:23:00] business account like we always did. It's totally illegal and I told the agent that we then went into that meeting that Thursday and I could tell you, Mr. Jacobs, I worked with Ray Lesniak 10 years. He know something was wrong in that meeting, and it wasn't because I was acting different. When I went back and met the agents, I told him to their face, yo, he know something wasn't right here. Ray was as cold to me as if I didn't know him. The other guy at the meeting said to me, Sean, if I didn't know you and didn't know your relationship with him, I would've thought you lied to me, and this was the first time you ever met him. But you were, but just to put that in timeline, they didn't shut it down because Ray was cold. You already got the phone call at the office. Four hours before I met Ray with the video telling you guys they were shutting it down. So it had nothing to do with my, didn't tell, oh, he's cold. I don't want make it seem like that because I know from my calls with Jordan back then, you just got the call early in the morning, Thursday, you couldn't return it. You [00:24:00] spoke to Cortez on Friday. You sent me the memo. It was getting shut down and from that point forth, I was never asked another question about Ray, Paul, you know, again, I'm only listening to people, Mr. Jacobs that we proffered with. I never got a call from Ray. I never got a question about Ray again. Never got a question about Paul. Never got a question about Knuckle. Never got a question about Jonathan, even though I kept telling them. Like this isn't about Tony. I even said to them at one point, if the only person you get out this is Tony, that's a sad thing. It's a travesty because he was a small fish, Mr. Jacobs, and it's wrong.

-E.J.: So, there's a period of about a year that this, that your cooperation has been dormant.

-S.C.: Yeah. Nothing.

-E.J.: Nothing's gone on since April or May of last year?

-S.C.: Correct. Except for, again, except for election time, November 21. Well say I got the call two weeks earlier in October, [00:25:00] mid-October. Oh, you know, we gotta go over those standard questions and then, um, I went over 'em. I didn't know anything that I could help them with because I'm not on the street. You need to be on the street to answer those questions.

-E.J.: Alright. Factually accurate, chronologically accurate that, uh, there's been no real cooperative effort in the last year. The obvious question is, uh, has Cortez told you within the last year that we should expect a very helpful, uh, 5K motion or letter within the last month? Within the last month.

-S.C.: Months. Months. No, he told, I could tell you, Mr. Jacobs, because I, believe me, I live, I think about these things every day. I'm not wrong on my timelines. He told Jordan, he, uh, Sean Farrell told Jordan that I earned a, uh, the exact words, I don't use this word, [00:26:00] stellar 5K letter. And he did that call with Jordan in early November of 22. So in, within the last five months. And I know it's early 20, I know it's early November 22 because we were, what we, me and Jordan were talking about was the work stuff that my court officer brought up. Remember Jordan?

-E.J.: Yep. Well, the logical conclusion to draw from those facts. Fact number one, there's been no meaningful, uh, cooperation in the last year. In fact, two, uh, within that year, certainly as recently as November of 22, uh, they expressed satisfaction, a stellar 5K, uh, motion. The logical conclusion to draw from those two facts is that whatever you did do between October of 21 and April or May of 22, uh, [00:27:00] was very helpful. Uh, to their investigations, whether we know it or not. Yeah, of course. Very helpful investigations, uh, and merits a 5K departure motion. But our problem in life is you would find it difficult, maybe impossible to make a list of people, uh, uh, for whom you gave them information in that. Six.

-S.C.: I think what I can do, Mr. Jacobs, is give you five things that, without naming anyone, the original five that we submitted. Right. And we gave it to 'em. It did, the information was in there. But I can't go any further and say, well, oh, you know, when you, I don't want you to get it and go, okay, well this was the initial meeting and then I don't see anything [00:28:00] else after the meeting.

Because I can't, I know. I could tell you for certain, Mr. Jacobs, I was never once questioned about Jonathan Williams. I was never once questioned about Donald Knuckle. And Jonathan was the cog that put all of this together. And I was never questioned about him once. Like, not even, I didn't ask me how tall he was. Where's he work? Nothing. Nothing. Not even the most ancillary question.

-E.J.: Were you questioned about your interactions with various other people?

-S.C.: No. As a matter of fact that Jordan will be, will remember this clearly. I kept telling them that you, Mr. Jacobs, wanted to keep the initial meeting. You didn't want it to be a hundred pages in a 10 hour meeting. So what I kept saying, and I'm sure Jordan will remember this, is this was just a surface scratch of the, this exact words I [00:29:00] used a hundred times. This is just a surface scratch of the information because Mr. Jacobs didn't want you guys to be sitting here for 10 hours. We just figured we'd give you an initial, alright. I never followed up on any of it.

-E.J.: That's hard to square with the enthusiasm that they expressed after we made our counter offer, uh, or our counter presentation, you'll remember they brought us in and put some of their cards on the table and we came back a week or two later and did the same. Uh, and they were very much impressed by what we said we had to offer. I thought I would've, or based on my limited experience, I thought that would've led to a bunch of, uh, in-person and telephonic debriefings. Each one commemorated by an FBI report. But you're saying that none of that happened. [00:30:00]

-S.C.: Well, what I'm saying is we did the initial one with you two with me and Jordan. Right, Jordan. Yep. He had COVID on the last one. That would've been November, early December of, you know, I'd have to look back. It would've been November or early December of 21. They, I get on the campaign with Ray and Paul. I'm taping those conversations using my own device and recorder. Um, Ray's gone the whole month of December, Mr. Jacobs, so I can't really do much with him. It's all by text. He tells me, listen, I'm not coming back until January 1st. He said he was outta state, whether he was or he wasn't. Irrelevant to me. That's what he has. That's what I have written to me in text. So I can't really do anything with him. I'm making moves on my own, telling the agents what I'm doing. Hey, I'm trying to get a campaign headquarters set up. I'm trying to do this. Um, but Ray's outta town, so I have no real communication with him. January one, Ray comes back. I have a meeting with Ray and a reporter [00:31:00] named Mark Bonomo on January 2nd of January,

-E.J.: Lemme stop you. Lemme stop for a minute. Maybe I don't have the timeframe clear enough. What is the day we took the plea? What is that day? You remember the day we took the plea?

-S.C.: What does that mean in court, Mr. Jacobs?

-E.J.: Yeah, well we did it by Zoom. We appeared by Zoom.

-S.C.: January. January 24th, 25th, 26th in that area.

-E.J.: Alright. Late, late January.

-S.C.: Yes.

-E.J.: So see this to an extent, uh, this narrows the cooperation period a bit.

-S.C.: I have a memo from you, Mr. Jacobs, that says you vigorously told Cortez like, why are you shutting this down? My guy's in there and at the end of the, yeah, your memo, it says, you know, we can't control what they do and you what, this is what it is. We're going to court.

-E.J.: Well, absolute. Absolutely correct that [00:32:00] what it was in your interest to defer that.

-S.C.: Of course

-E.J.: as long as possible.

-S.C.: No, of course.

-E.J.: So that you'd be more valuable for a longer period of time. But just thinking out loud, we signed these agreements in October of 21, and if we took the plea late January of 23, 22, uh uh, I'm sorry, 22, uh, as a practical matter, October, November, December. We got at most a four month period for which you are most valuable to them.

-S.C.: Mm-hmm.

-E.J.: Because after that, the world knows, the world knows or suspects. Now that doesn't mean that after January you became useless. You're still a source of information, you know? Look at this photograph. Why are these two people together? What happened before that? What happened after that? Listen to this recording. Identify the voice. Uh, tell me what, what is the context of,

-S.C.: They've [00:33:00] never, Mr. Jacobs on those 300 recordings. They never once came to me with one recording and said, Hey, Sean, we hear you at a meeting. Who's on this recording? What is the context of this?

-E.J.: Yeah. The only conclusion I can draw from. What you've now made me understand to be the facts, uh, is that in the October, November, December, and early January period, you must have hit what they considered to be a couple of months, um, for, for them to say after that, after that, that you had earned a 5K motion. Whatever they hope to get outta you, they must have gotten in those three or four months. But none of it is what is ordinarily done with a person in your situation. Yeah, I mean, in a period of a year and a half a person in your [00:34:00] situation, if I were cross examining them, I, I'd expect to see a, a thick binder, uh, a couple inches thick, uh, of debriefing reports, and that apparently doesn't exist.

-S.C.: No, I, Mr. Jacobs, believe me, I'm not downplaying anything. I wish I could get on here and tell you I gave them the world and then some. Yeah, it's gonna help me. It's not gonna, I'm not trying to hurt myself here. It's gonna help me, but just didn't never happen. I'm telling you from, from, so let's just go from January 13th, the day you get that phone call. I'm never asked about another person besides Tony Tex ever. with the exception of the organized crime meeting. But again, I don't know why they came to my house, Mr. Jacobs. I never represented that. I knew these people. They asked. Yeah.

-E.J.: I think they were just checking off a box.

-S.C.: Yeah. And I'm sure they were. But to never come back to me and [00:35:00] even say, Hey, listen, well, we had Ray for, for 12 days in, in your while you were on the street. Did, did he say anything else or did he do anything else? No. Or, or Paul, I was talking, even Paul on the phone at the time and, and taping it and, and Stephanie, and just never happened, you know?

-E.J.: Yeah. Can we dial back to the recordings that you made yourself, um, and offered to them? Not, not the ones they seized from you.

-S.C.: Mm-hmm.

-E.J.: Isn't there a. That they did not seize from you, correct. Which you offered up to them and they did not take

-S.C.: Yes, I did. I offered them up. Mr. Jacobs and I'll give you just a, I'll go back and look at the tapes, but through the conversation with Bryzick, I offered them up in either June, July, or August of 22, and he [00:36:00] never, never followed up with me. And I explained it in detail, Mr. Jacobs. I said, Hey, I did this because, you know, I was afraid that somebody could get their hands on them. I knew they'd be safe there. I'm getting 'em sent back to me. Now when they come, do you want them? He showed

about as much enthusiasm as me telling him. Next time I see him, I'll kick him in the balls.

-E.J.: Well, the only two conclusions you can draw from that are either, uh, they're just incompetent, uh, or they, um, were satisfied that they already had all they needed, um, between you as a cooperating witness and an insider and the recordings they seized. I suppose they could have made the judgement. They didn't need anything else, but I, I don't know. Well, okay. That changes my [00:37:00] strategy, uh, quite a bit because, uh, their 5K letter, if it's consistent with your recollection, is going to recite that you didn't indeed cooperate. But in a timeframe that appears to be bounded by October of 21 to May of 22, uh, and nothing. Or at least not much thereafter.

-S.C.: And let me just be, just to, just so you have this as well, because you, you may think of this later or already thinking it in that timeframe of October to January. No one knows I'm a cooperating witness, or at least we think they don't. Right. Right. They don't, they don't. Outside of we, you know, to push you back, Mr. Jacobs, you, you and Jordan were the one who said to me. Hey, see if you can get back in with Ray. It wasn't them. You asked me to do that, and I did it. I was, it took me about a month and [00:38:00] I did it through Stephanie, Bryzick was excited about it, meaning the FBI agent. But Jordan, the US attorney's office wasn't, remember?

-J.B.: Yeah.

-S.C.: Because what happened was I called Jordan and said, should I tell the agent I got back in with Ray or you? Jordan said, let me talk to him. Bryzick was excited. The US attorney's office wasn't, so if you go into that period, Mr. Jacobs, Ray's gone all of December. I'm not talking to him once on the phone. He's outta state. He's telling me I won't be back 'till January one. January 13th, you get the shut down call. I had literally 12 days to get a handful of conversations at Ray. What was I gonna do? Call him up and say, Hey, how do we wash money? And I can't do that. And I kept telling them that, like, hell no. Immediately I don't, I don't operate this way. And during that period, while I'm on the street, they don't have me calling anyone else besides Tony Tex. So they don't say to me, Hey, Sean, you know, you identified Jonathan Williams, you did X, Y, and Z with him. Why don't [00:39:00] you go rehash one of them conversations? No, no. The only conversations I was told to have directly was with. Was with, um, was with Tony. And then when Ray got back, I told them what I was doing. We, I relayed over the phone conversation and it lasted literally 12 days. Nick Scutari got sworn in on the 12th. They shut it down on the 13th. And again, I'm not trying to minimize anything. I just want you to understand what it is, Mr. Jacobs, so I don't. Where, where you don't think, well, oh, while he was on the street, they probably had him calling A, B, C, you know, these five people. No, that never happened. Right.

-E.J.: Okay. Well that's why we're having this conversation. Um, alright, so if the plea was late January of 22, if, if it was, you'll, you'll remember that when we took that [00:40:00] plea, I, I told you. Uh, that this is a case where we should expect, uh, that you would be detained, not released on.

-S.C.: yeah, of course, without a doubt, but

-E.J.: detained. Um, shortly before the plea, very shortly, maybe the day before or maybe even that day, um, I had a discussion with Cortez. When he told me that, uh, they were not going to ask for detention. Now you didn't have to be a rocket scientist to figure out that the reason they weren't going to ask for detention was because detaining you, put you at the, some federal detention center would make it much more difficult for them to use you as a cooperating witness. Uh, so they weren't trying to be [00:41:00] nice to us. They were trying to make their lives easier, uh, by, uh, having you out where they could interact with you easier, uh, than having you in a federal detention center where they'd have to go through security getting in and out, be a big pain in the ass for them. And I, I still think that's why they did it. Now if they did that in January, why did they not continue to interact with you and, and use you as a cooperating witness?

-S.C.: Well, they, they,

-E.J.: basically petered out after that.

-S.C.: They all day, all the conversation. And I'm a thousand percent positive on this because what had happened was, one of my concerns, Mr. Jacobs, was obviously, well, when I go to court, everyone's gonna know I'm an informant, so everyone's gonna stop talking to me. I relayed that to Jordan, and Jordan said, no, they assured me they, they're still gonna go through all these different things with you. And we took it at that. The only [00:42:00] conversations that I ever had, you know, well just call it January 25th, Mr. Jacobs, we'll call it the 27th. No later than that, January 27th, 2022 forward. The only conversation I had related to my cooperation was Tony, Tex, and the payments made to him via cash or checks. They never asked me about Ray. They never asked me about any of the other people. They never asked me about what I kept repeat. Jordan joked around one day and said, Jesus Christ, you said it a hundred times that this is just a surface scratch of what you have. they never came back to me and said, what does that mean? Nothing. It just never happened. We never did an in person meeting again except for the organized crime meeting. I never met those guys in person. It was just over the phone to say, Hey, uh, we see a cash withdrawal. Is that, did you give some of that to Tony? What piece did went to Tony? Nothing else. Never again did we never met in person again. [00:43:00]

-E.J.: Okay. Well, this changes, uh, what we can put into the, uh, pre-sentencing memo. Uh, would the can of course recite the existence of the plea agreement, the Schedule A and the cooperation agreement. Uh, and we can, of course, recite the non-binding nature of the sentencing guidelines. We can, of course, rely on the sentencing statue 35 53. We can do all that. What we can't do is claim 20 months of cooperative efforts. What we can't do. Uh, is, uh, give the judge a count of potential targets. Uh, and what we can't do, uh, is tell the judge the sorts of things we did to help them on each potential target. We can't do any of that, uh, which is what I had hoped to do. What we have to do, I think, [00:44:00] is in on 5K motion or letter says, which we're not gonna know until very shortly before we get it. That's pretty much where I didn't wanna be.

-S.C.: Uh, I mean, I, again, I don't know if this works. It is fact. We're not lying is I can list the initial five, the you know, I did speak about the ILA. That becomes six, right?

-E.J.: You, you're right. We can say something about that. We can, without naming names in the memo, we can correctly recite that, that we made a, uh, counter, uh, proposal, uh, which led to the cooperation agreement or counter proffer, which led to the cooperation agreement and we can, without, again, without naming names.

-S.C.: Yeah.

-E.J.: [00:45:00] Say that that counter proffer, uh, identified four or five or six, whatever it was, uh, potential targets about whom you were willing to provide information. You're right. We could do all that and, and I guess we should do that under the circumstances.

-S.C.: I was concerned, Mr. Jacobs, just so you know, when Jordan initially told me about the stellar 5K letter. I didn't get excited, Mr. Jacobs, because what I became concerned about was this very day you were reviewing that 5K letter and me looking at it and going, yeah, I, I'm gonna take whatever they give me. that's stellar, but I'm not gonna sit here and lie to you and say, oh, I did all these wonderful things and I was James Bond out there, and I was questioned about 97 people. I just wasn't, it never happened.

-E.J.: Well what I was hoping, uh, to assure is that whatever the content of the 5K letter, uh, we gave the judge the full universe of your cooperation.

-S.C.: Exactly. No, I know [00:46:00] that's what I was worried about.

-E.J.: It. It doesn't sound like we, we can preemptively do that. Uh. So let's see what the 5K letter says and let's see what it doesn't say and if they omit anything.

-S.C.: You know, that's what I was hoping for, Mr. Jacobs, is whatever they consider stellar, maybe

there's something not in there that I actually did talk about it did do, that we could add and say, no, no, no. He did this.

-E.J.: Well try again to get Cortez to get us this 5K letter. Right in draft form somehow. So we, we at least have that in mind when we do the memo. Now, your Judge Vasquez, who was a good draw to start with, he's one of the few federal judges who actually has a criminal defense background. He was a, I think a partner, if not a partner, an associate good friend of mine. Mike Crichley, [00:47:00] uh, one of the best lawyers in the state had a lot of cases with Mike. He sent me some cases. Um, he was a good judge to start with. He's now, he's one of a handful of federal judges who are retiring.

-S.C.: Exactly. Yeah. Uh,

-E.J.: So it, it's good to get a judge doing the sentencing when he's on the way out, because

-S.C.: Oh, that's a good, that's a good thing, Mr. Jacobs.

-E.J.: I, I think it is.

-S.C.: Okay.

-E.J.: Uh, because, you know, if he. If he, uh, were to be more generous to us, uh, than another judge might be. He's not gonna take any flack for it because he's gonna be gone.

-S.C.: He's gonna be gone. Yeah. I didn't think about that. Yeah, you're right. I never thought about that.

-E.J.: So, so he's, he's an okay guy, uh, to do this. Um, alright. What, what is the set date? 28th. 29th. 29th. Okay. And today is the 16th. So we have 13 [00:48:00] days. Um, see what, if anything, you can shake out a Cortez. Okay. And then let, let's just, today is Friday.

-S.C.: Um, I could write everything up for you over the weekend, and I know you have a certain style of right, but

-E.J.: It's, it's not gonna hurt. Go ahead and do that and get it to Jordan and Jordan. See what you can see. If you can get a draft of whatever our memo is with or without Cortez's letter. She can get me a draft of that Wednesday. I gotta take my wife up to a doctor in Philly. Uh, but we're not leaving until about 12:01. So see if he could get it to me by sometime Monday morning. Uh, and, and actually I could even read it on the way up the way back. Um, I want to get something under the judge's nose. It's not gonna be what I have been thinking about the last couple of days, but I wanna get something. So whatever notes you can put together, [00:49:00]

-S.C.: get them. Yeah. I'll look up the dates, Mr. Jacobs, to make sure they're accurate. Like I said, for the purpose of this conversation, they're not more than a week or two inaacurate.

-E.J.: That's fine. That, that's fine. Now, Sean's idea, which he's mentioned a couple of times about going right back to our, uh, counter proffer. I, I think that's the most we got to work with right now. So we had a nice outline that we collaborated upon and, you know, that deserves a paragraph. Uh, in, in the memo. This all started with our counter proffer. Yeah. Which led to a cooperation agreement and that this sub to that counter proffer involved however many it was four or five, six, uh, high level political, politically profiled people. That's a good start. Okay. Alright. Uh. Look, let's adjourn. Get whatever you can, which might be helpful to Jordan.

-S.C.: Jordan, I'll [00:50:00] get it to you late Sunday night. You obviously need a day or two to go through all the dates and stuff, but they'll be accurate. So you know, you don't gotta waste time cross referencing them, you know what I mean? They'll be as accurate, that's fine, based off our emails and dates. So you don't have to at least go back and check my work. I'll, if I'm sure, if I'm not sure on a

date, I'll highlight it and say, Hey, I'm not sure on this date.

-E.J.: Alright, then see if you can get a draft in my hands on Wednesday morning. Okay? Yeah. Okay. Sean, you're looking good.

-S.C.: Thank you, Mr. Jacobs. And uh, we'll talk next week. Alright, Jordan, I'll follow up with you over the weekend.

-J.B.: Alright brother. Good.

Exhibit B

Exhibit B
Email

June 17, 2023
6:33 P.M. EST
From: Sean Caddle
To: Jordan Barbone
Subject: 5K Letter

Please read this carefully before Monday because I want to address the following.

I have read my stellar letter multiple times today. I have read other 5K letters over the past year and mine dont even resemble one that deserves a departure.

Here are my questions and concerns. Why it was nice to speak with Ed he doesnt seem to be much aware of what I have been saying for the past year regarding my cooperation. Now why I understand Im the person accused of Murder and my word dont carry much weight I am also the person that dont need to lie regarding what was spoken about with the agents and what wasn't as I have those recordings on tape.

The Judge. The exact words we were told was "Judge routinely goes along with recommendations". So far in this case he hasnt gone along with Cortes's recommendation once. This is a concern for me.
My 5K letter is filled with half truths. Why cant we just tell the truth in regards to what was offered and what was asked of me. You cant have quote "actionable outcomes if you are not asked to provide information to make those accusations actionable".
Correct?
Lies. I have been lied to multiple times by the Government in regards to my situation and lies have been told publicly that effect my family. So Im not to trusting these days in what these people have to say. That begs to ask the question why should I trust in anything we are attempting moving forward.

Last and most important to me so everyone can understand my mindset. Make no mistake my Mother mothers health decline rapidly since 2019. Why? Because the Government want to loop an innocent women into this. Well she is dead and im not feeling to good about it today. My family lives in poverty. Again why this may not matter to anyone else but me let me be very clear that was lies to me and my family. Lies my cooperation would continue after court. After court the only person I was asked about was Tony. When OC came to my house Mark Brzyzk called me 15 minutes before and told me not to tell them about the cash given to Tony or anyone else. Then my Court officer calling me on Video October 7th, 2022 at 6:50 at night in front of my family to tell me about a move that was never to be or Farrell telling you I could work which wasnt true as well. Last the stellar 5K letter. That letter is about as stellar and as those whos information couldnt be corroborated with the exception of Tony.

Im done with the lies and bullshit. If telling the truth about what occurs fucks me so be it.

My mother died a person accused of being in a Murder Conspiracy only to a few weeks later being able to sign for my bail. Again why this may not matter to most it matters to me. It was my mother and I watched her die from the stress and the deuteriation of what may happen if I decided to tell the truth or fight.

While im sure many other men in my shoes could care less how those around him were effected by "go along, get along" that isnt me.

The press labeled me a big time snitch when I wasnt questioned about people I proffered against. I walk with that. Paul Weiner is on tape doing the same thing Tony Teixeira did as well as a half a dozen to a dozen other people. They werent interested in that and thats ok but what the hell am I carrying the water for them for.

I quote Ed "we cant go in front of the Judge and Lie" so why are we creating a document that doesnt tell

the truth of what occurred. Someone needs to explain to me why im going to go along with doing this. What to protect Cortes and the DOJ or the Agents or the corrupt people that took with me while creating shell accounts for every donor up and down the state to kick into.

I didnt need a lawyer to tell me what laws were broken and in the tapes they took, a Lawyer actually told me what laws were broken because he was a part of what took place and was concerned we were all going down for it.

See you Monday ......

Sean

EXHIBIT C

EXHIBIT C
TRANSCRIPT
OF
AUDIO RECORDING

June 28, 2023
10:45 P.M. EST
Participants: Jordan Barbone (Jacobs & Barbone Law Firm)
Sean M. Caddle

-S.C.: Bro.

-J.B.: I'm so sorry.

-S.C.: No, don't worry about it, man. I'm up anyway, so it's no biggie for me. I feel bad for you. Long day, huh?

-J.B.: Yeah. Horrible. Well, I just dropped that off. It's uh, you know, you are even more depressing when you gotta drive around that fuck face all fucking day and sit through a mediation with them and then drop 'em all off.

-S.C.: So,

-J.B.: Uh, yeah, I just did that. But listen, here, here's, um, here's what I'm [00:01:00] fixing to tell you.

-S.C.: Good. Uh,

-J.B.: Cortez responded to my response, I guess, with literally nothing more than Jordan. Thank you for getting back to us. Um, we're gonna submit the sentencing memorandum the way you say we should, and the way I said we should, and the way Ed said we should is exactly what you and I have already discussed.

-S.C.: Um, yeah it, it hit the paper, Jordan. I got, you know, I wasn't gonna bother you. ABC News got your sentencing memorandum because the article specifically references you guys asking for the nine years and the government asking for 15.

-J.B.: Really?

-S.C.: Yeah. I'll, I'll send you the article so you have it, but I, when I, when it came through on a Google alert, I pulled it and I normally don't [00:02:00] read a lot of the articles running 'cause I get pissed. So, I, I read the article and it said the government's asking for 15, Jacobs is asking for nine. I'm, I'm obviously simplifying it says more than that. But when I seen that, I said, well, it said they got it.

-J.B.: So here's Sean, um, from me, Jordan Barbone as your friend, as your brother, as your fucking lawyer. Here's what I can tell you. Um, I just had dinner with Ed and here's our position. Um, number one, legally we're right. Legally they're wrong. Number two, um, right off the bad, we're going to tell Judge Vasquez tomorrow that we intend to argue everything. That's in our sentencing memorandum. Simple as that. And if [00:03:00] he's going to try and limit us, which either I or Ed believe will happen. Um, just, you know, just from Ed's experience and I guess my legal research, there's there's really no basis for the judge to limit anything we're arguing tomorrow. So here, here's the point. Um, whether or not Cortez is, I guess, ready to set the fuck up and say whatever he wants to say, that disputes what we have to say, whether or not he chooses to do that, um, we intend to argue everything that I already told you, we intended to argue everything that's in our sentencing memorandum, unless for some reason the judge says we can't argue it. And then [00:04:00] that, um, step three is this. If everything you and I have been talking about with, uh, the added caveat of, now I'm discussing it with Ed and it's quite simply

this, um. In the event Cortez tries in any way, shape or form to dispute what you've done as a cooperator or to limit or try to, you know, not address it publicly, it's very problematic for him because Ed's going to take the approach that you and I have discussed. That, um, Cortez and myself has discussed, have discussed, uh, the approach is this, look government, this is what you fucking said about him. This is what he did. This is what our agreement was. This is what the plea agreement [00:05:00] says, and this is why you are wrong about the simultaneous, um, interpretation of the plea agreement and the cooperation agreement. And on top of all that. This is why your request is just ridiculous in terms of what we say is 20 months of solidified cooperation with high level political people just like you bargained for when you did this in January, you know, before that. But between October of 2021 and January of 22. And you know, I, I think that is. The very simple proposition. Um, look, you and I have fleshed it out. There's no question about it. Ed and I have fleshed it out. At the end of the day, does anybody have a crystal ball sitting at the desk knowing what Cortez is going to do? No. Um. What I [00:06:00] said to you last night and the day before is the same. I said to Cortez, and you know me, I'm not hiding any, um,

-S.C.: No, no. Jordan, I, I, me and Luisa had told,

-J.B.: Let, let, let this the last thing I'm gonna say. Um, I ended here. What I said to Ed was what I told you yesterday and the day before, um, the way Lee Cortez reacted to, um, our sentencing memorandum. I believe in my mind is a very good indication of the way he is going to react tomorrow. And if that's the case, there's. Again, I told you this a week ago. There's no other individual in, in the entire state that's going to, um, put his nonsense to beg the way Ed went. I guess that's my point.

-S.C.: No, I, Jordan, I, me and Luisa [00:07:00] had talked about it obviously since me and you talked about it, and I said to her, Luisa, I said, I, I picked these guys years ago. I said, it's, it's the moment for Ed to be who he is, and we gotta have faith in that, that he is who, who we always thought he was. You know what I mean? Nobody's God, nobody's anything but. Ed was picked because he was Ed. right. So at the end of the day, he just needs to be Ed. Right? That, that's what he needs to be. I said, and I, I can't imagine under any circumstances, he's not gonna be Ed. He's not gonna get pushed. He doesn't like Cortez. He never liked him. From the day I walked in the office, I, I can't imagine like Cortez, he could slap him around a courtroom. I said, I just don't see Ed that way. I said, I never seen him that way. I said. I, you know, you at some point, that's what you gotta do. You know? And, and that's what it said, right? And, uh,

-J.B.: I'll add one thing to all that. And look, I know it only goes so far for, um, [00:08:00] for you and honestly for, for anybody and the, uh, not only in the situation that you're in, but anybody's situation, uh, this is the only other thing I can add. We referred yesterday. A very, very substantial case to Mike Critchley. Um, we did it for the purposes of this. The case had been on the back, and I never told you about it, and I never would, because you know how this whole,

-S.C.: Of course, no, no

-J.B.: operates, but we've had this case on the back burner for. I am gonna say five, four or five, maybe six months. Um, I did a little bit of work on it. It was Ed's, uh, originating case that is now, uh, my best friend. You'll [00:09:00] remember Dave.

-S.C.: Oh yeah, Dave, yeah. Yeah.

-J.B.: Dave's now handling case. Anyway, uh, we referred a massive, massive portion to the case, uh, to the case. Yesterday to Mike Critchley. And, um, I didn't tell you about it in advance. I never would. But, uh, obviously it was all calculated. Um, we weren't gonna do it too far in advance. We weren't going to tell you that we were going to do it. We were just going to fucking do it.

-S.C.: Yeah.

-J.B.: And, uh, we did it. And Critchley reached out today to Ed. And, um, it was unprompted. It wasn't

like we sent him a letter

-S.C.: Yeah. It wasn't like. Exactly.

-J.B.: It wasn't like, yo, here's a case.

-S.C.: Here's a case. Call me right away.

-J.B.: Exactly. We got Sean to sentencing on fucking Thursday. We know you're best friend with Judge [00:10:00] Vasquez, so here's big case for you.

-S.C.: But

-J.B.: We sent him a case and he emailed Ed today and said this, uh. Thank you so much for the case referral. Uh, good luck on Thursday. Now, that's all he said, but it goes a long way.

-S.C.: Of course it does. It, it

-J.B.: I'm not going to say any more than that, but Ed and I had a, uh, you know, pretty liberal discussion for, you know how it is. I, I guess a fucking week leading up to it. Um, like it was some big planned, fucking attacked by Ed that was going to just absolutely turn the tide. But the point is this, um, you know, we held it and, and until yesterday and we gave it to him. And there's no doubt in my mind that, uh, as Judge Vasquez, his best friend, [00:11:00] he's doing. Whatever he can to help us. Now, is that gospel?

-S.C.: No, no. Good. Jordan, I, I wanna cut you off. I, I just wanna cut you off real quick. I, my brother Jordan was going to court in Belleville as a Jersey City kid. Shit scared. He was supposed to get timed. We, my father's lawyer was still in the system, so he is wrapping my brother and we're walking in. My mom's hysterical and I swear to God to you, he doesn't, he goes, oh, we drew. Pete Smith, I gave 10,000 to his nonprofit fundraiser three months ago. Good. And we're all standing there and he goes, well, I think we are anyway.

-J.B.: Uh, you know what I'm saying? Here's the point. Um, look, you know who you're rolling in with tomorrow. And, um. You know, I, I've, I've never doubted you as a person from the day that I [00:12:00] had the first telephone call with you, and until right now, and I've never doubted my boss either. I may hate him, I may tell people that he's the most soulless and the most heartless person in the fucking world. It's the truth. And that's just the person that I am. Um, I, I, I say what I believe, I say what I feel. I'm not the typical warrior who's gonna swindle and, uh. You know,

-S.C.: No, Jordan, I, I, listen

-J.B.: Whatever money you can.

-S.C.: My relationship with is with you, I never really got to know Ed. That's just, just the way it worked out. So I was always gonna defer to you in these conversations. It, you know, he didn't, it wasn't, oh, I was an anti-Ed. I didn't know him. You know what I mean? It Just like your dad. I really didn't know him. You know what I mean? I, I liked him when I met him. It was really very nice to me. Down earth, cursed cool, funny, but I just didn't know him. The only person I ever really got to know in depth was you. So I was always gonna defer to you. [00:13:00] So you, you know, listen, I think Jordan, like I said to Luisa at some point, and even Luisa came around on Jordan, she even said, you know, Sean, you're right that. You know, they were hired for this reason, and, and Ed was the caveat and the, the string dangler and we, Jordan, we built a relationship with, at some point, you gotta rely on Ed being Ed and knowing the system the way he does because he's done it for so long. Very few people have done it as long as Ed and, and all of that. So I, I'm good with it. Jordan, I need to, to switch topics with you real quick. I only got cash, Jordan, and I can't get an Uber with it. Can you order me an Uber and I'll give you the cash when I get there. It's like 55 bucks because I only got 30 bucks in a bank until Luisa gets

a check on Friday. But I can give you the cash. I got cash.

-J.B.: Whatever you need me to do, because, um, absolutely that's,

-S.C.: I got a ride back. My cousin fucking goes to me. I'll give you the car. I said, Kelly, I don't know what's gonna happen.

-J.B.: Well, here's all I need you to do. Here's all I want you to do. [00:14:00] Um, as soon as we hang up, send me your address.

-S.C.: I'll send you my address now.

-J.B.: Hold on. I just got that the fucking, I swear to God, one day you're gonna see me on the news and I'm gonna blow up a fucking here in city and I'm gonna be sitting in the pen and I don't give a flying fuck about it. I hate all of them. Send me your address. I will. Um, I will absolutely make sure to get you an Uber. Yes. It's not a problem. Uh. Yeah, no issue.

-S.C.: Alright, cool. I'll, I'll shoot you the address and then, you know, I'll just text you in the morning. Alright.

-J.B.: You got it brother. I'll be up by, uh, I'll be up and moving by 6:00 AM if you need, call me. I'll be around.

-S.C.: Thank you, brother. I appreciate it.

-J.B.: Okay.

Sean Caddle
Reg. No. 83176-509
Federal Correctional Institution
Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640




U.S. District Court
Clerk of Court
District of New Jersey
50 Walnut Street
Newark, NJ 07102

CLERK
U.S. DISTRICT COURT
DIS...CT OF NEW JERSEY
RECEIVED
2026 OCT -1 A 11:26

*PLACED IN PRISON
MAILBOX ON 9-24-2026
PRISON MAILBOX RULES APPLY*